**Ray Anthony SCOTT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 03–97–00311–CR.**

Court of Appeals of Texas,
Austin.

May 7, 1998.

Rehearing Overruled June 4, 1998.

---

4. *Emerson v. State*, 880 S.W.2d 759, 769 (Tex. Crim.App.1994).

Walter C. Prentice, Austin, for Appellant.

Ted Weems, District Attorney, Steven W. Keng, Special Prosecutor, Giddings, for State.

Before YEAKEL, C.J., and KIDD and DALLY, JJ.*

CARL E.F. DALLY, Justice.

Appellant Ray Anthony Scott was convicted of the offense of attempted capital murder. *See* Tex. Penal Code Ann. §§ 15.01, 19.03 (West 1994). The jury assessed appellant's punishment at imprisonment for 99 years. In two points of error, appellant asserts that the evidence is neither legally nor factually sufficient to support the jury's verdict of attempted capital murder as charged in the indictment. We will overrule appellant's points of error and affirm the trial court's judgment.

It was alleged that appellant on or about the 17th day of February 1982, did, with specific intent to commit the capital offense of murder of Jeanette Mattson Nickel, strike her about the neck and facial area repeatedly with his fists and remove her clothing, which amounted to more than mere preparation that tended but failed to effect the commission of the offense intended. Appellant urges that the evidence admitted at his trial, which began on August 28, 1995, is insufficient to support the verdict because there is no reliable evidence to connect appellant to the savage attack upon Nickel.

In reviewing the legal sufficiency of the evidence, the test is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99

---

* **Before Carl E.F. Dally**, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1988).

S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Staley v. State*, 887 S.W.2d 885, 888 (Tex.Crim. App.1994); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988). This standard of review is the same for both direct and circumstantial evidence. *Geesa v. State*, 820 S.W.2d 154, 162 (Tex.Crim.App.1991); *Mack v. State*, 859 S.W.2d 526, 527 (Tex.App.— Houston [1st Dist.] 1993, no pet.). In reviewing factual sufficiency of the evidence we view all the evidence without the prism of in the light most favorable to the prosecution; we set aside the jury's verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996). *Clewis* approved this standard of review first articulated in *Stone v. State*, 823 S.W.2d 375, 381 (Tex.App.— Austin 1992, pet. ref'd untimely filed). More recently the Court of Criminal Appeals has admonished: "We emphasize that in performing a factual sufficiency review, the courts of appeals are required to give deference to the jury verdict, examine *all* of the evidence impartially, and set aside the jury verdict 'only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.'" *Cain v. State*, 958 S.W.2d 404, 410 (Tex.Crim.App.1997) (quoting *Clewis*, 922 S.W.2d at 129).

█ On February 14, 1982, Jeanette Nickel, who was buying oil and gas leases for various oil companies, checked into the Classic Inn Motel in Giddings. On February 17, she met with several business men, drove to Austin to the Railroad Commission offices, stopped in La Grange for lunch, and returned to her motel room in Giddings. Later she drove to Bastrop for dinner and again returned to her motel room. At approximately 10:00 p.m., she received a telephone call from an oil man in Abilene. While taking the call she turned on the lamp on the table by the telephone so that she could make notes concerning the call. Her telephone conversation was interrupted by a knock on the door. She asked the caller to hold while she went to the door. She asked who was at the door but when she could not understand the answer she "cracked" the door. A "black man was standing there ... with his fists up and all crouched down, and

that fist came through." Nickel screamed so that the man on the telephone could hear her; she then lost consciousness.

Sulaiman Thobani, the manager of the recently opened Classic Inn Motel was at the motel that evening to check some records. Paul Brown, the assistant manager who was on duty took a call at the switch board from the man in Abilene who had been talking to Nickel. The caller alerted Brown and Thobani to trouble in Nickel's room. Both men went to Nickel's room and knocked on the door. A man's face appeared momentarily at the window of the dark room and said everything was all right. Thobani went back to the office and called law enforcement officers. Thobani then returned to the room and found Brown five or six feet from the room door where he had been pushed after trying to tackle the man who ran from the room. Brown entered the room and found Nickel huddled underneath the wash basin, naked and bleeding.

Ron Stewart, a Lee County Deputy Sheriff was the first officer to reach the motel. He saw Nickel sitting on the bed and Brown was holding a towel to her face. Nickel had been severely beaten about the face; her head was "two to three times" normal size and blood was pouring from her nose, mouth, eyes, and ear. Again Nickel lost consciousness and regained it only for a short time in the ambulance which took her to a hospital in Austin. She was unconscious for a week and remained in the hospital for three weeks. She could not walk without assistance for a year. Nickel suffered extensive damage to her facial bones, which were reconstructed in twelve hours of surgery. Her upper and lower jaws were crushed; her voice box was damaged permanently; her sinuses were torn; the orbit behind her left eye was damaged; her back was severely injured.

Texas Ranger Frank Malinak had been a Captain in the Lee County Sheriff's Office on February 17, 1982. That night he was called to the Classic Inn Motel where he obtained a list of all current motel guests and he recorded the license plate numbers of all of the cars parked at the motel. Later, Ranger Malinak accompanied Danny Carter, the supervisor of

the Texas Department of Public Safety's latent fingerprint section, to Nickel's motel room. The lamp shade had been pushed back and Carter noted that the light bulb in the lamp had been unscrewed. Carter "dusted for fingerprints" and found a print on the lamp's bulb and a bloody print on the inside of the doorjamb.

Ranger Malinak continued "off and on" for several years in an unsuccessful attempt to match the fingerprints found in the room to those of suspects. Several years after the offense, Ranger Malinak was in a class in which officers learned of the Department of Public Safety's Automated Fingerprint Identification System (A.F.I.S.). It occurred to Ranger Malinak to submit the fingerprints found in the motel room for an A.F.I.S. search. This newly available technology soon identified appellant as a suspect. Carter then compared the fingerprints found on the light bulb and the doorjamb with appellant's known fingerprints. At trial Carter testified that in his opinion the fingerprint on the bulb was that of appellant's left middle finger. The print found on the doorjamb was that of appellant's left ring finger. Carter testified that he had never seen or heard of any two people having the same fingerprints.

Joe Goodson, the Sheriff of Lee County, was the chief law enforcement officer responsible for the investigation of the assault on Nickel. Sheriff Goodson arranged for Karen Taylor, a forensic artist, to make a drawing of Nickel's assailant. Taylor made this drawing after interviewing Brown; the drawing and a physical description of Nickel's assailant was circulated in surrounding counties. These posters described Nickel's assailant as "19 to 22 years of age; boyish facial features; medium complexion; hair, approximately 2 inches Afro, black. Facial features are sloping forehead, narrow lips, narrow nose, flat cheek on small chin sloping back, protruding muzzle. The body description is broad shoulders, small waist with a muscular neck and stomach and arms. Last seen wearing tan shirt with sleeves cut off at the shoulder and the bottom of the shirt cut off exposing midriff, blue jeans."

Karen Taylor, who was employed by the Texas Department of Public Safety, was qualified as an expert witness. She testified she interviewed Brown and with his guidance drew a picture of Nickel's assailant. Brown at the time of trial was a resident of Maryland and was not a trial witness. Taylor gave her original drawing to law enforcement officers. However, she made and retained a copy of the drawing. The copy of the drawing and a 1986 photograph of appellant both enlarged to approximately the same size were admitted in evidence and were before the jury for its consideration. Taylor made a "side by side" comparison of her drawing and the 1986 photograph. Taylor saw a general resemblance between the drawing and the photograph. "[T]he placement of the features on the face are very similar ... the height of the forehead, the distance between the eyes, the width of the nose, the general size of the mouth, the width of the cheeks tapering down to a narrow chin. All of these things are similar."

D.N.A. technology for use in criminal investigations and trials was perfected after the initial investigation in this case. Therefore, materials were not taken from this crime scene for the purpose of D.N.A. testing. A vague record implies that some evidence existed after appellant was identified as a suspect that could be used for D.N.A. analysis. An analyst was present at trial and prepared to testify concerning the *results* of a D.N.A. analysis but the results had been obtained by another analyst who, without explanation other than she had not been subpoenaed, was not present at trial. Defense counsel objected to the witness's testimony concerning the results of the analysis that she had not made. The State then withdrew its proffer of the witness's testimony concerning the results of the D.N.A. analysis. No evidence resulting from D.N.A. analysis was admitted for the jury's consideration.

Evidence was admitted that appellant had never been a motel guest or employee at the Classic Inn Motel and he had not been an employee of the builder of the motel. Appellant, who lived in Fayette County which adjoins Lee County, told investigating officers

he had never been in Giddings or at the Classic Inn Motel. Although there was testimony that the Classic Inn Motel had been open for one month, there was also testimony that it had been open for only two weeks before Nickel was assaulted there.

Tommy Michalka, a Fayette County Deputy Sheriff, testified he had resided in Fayette County for more than 30 years. Deputy Sheriff Michalka was acquainted with most of the residents of Fayette County and was personally acquainted with appellant and appellant's family. On May 28, 1982, Deputy Sheriff Michalka had observed appellant adopt a disguise by wearing a wig.

■■■ Appellant asserts that a latent fingerprint matched to appellant over thirteen years later is insufficient evidence standing alone to sustain appellant's conviction. In circumstances where it is clear that the fingerprints were not necessarily made at the time the offense was committed, fingerprint comparison alone is not sufficient to establish the identity of the accused. *See Dues v. State,* 456 S.W.2d 116, 117–18 (Tex.Crim.App. 1970). However, in proper circumstances, the identity of one committing a criminal offense may be conclusively proved by fingerprint comparison alone. *See Grice v. State,* 142 Tex.Crim. 4, 151 S.W.2d 211, 222 (1941).

It has long been held that evidence of finger print comparison was admissible as a circumstance upon the question of identity, but the point here important is, Does the weight of authority in the United States regard it as conclusive proof of identity under conditions here shown to be present? Our investigation leads us to conclude that where the evidence, as here, shows the finger print found at the scene of the crime was left there by the criminal at the time the crime was committed, thereby excluding the hypothesis that it might have been placed there innocently prior to or subsequent to the commission of the crime, and the evidence further shows that said print is identical with known prints of accused, that such evidence satisfies the law and excludes every

reasonable hypothesis save guilt of the accused.

*Id.*

But whether evidence concerning fingerprints, standing alone, is sufficient to sustain a conviction will depend upon the facts and circumstances of each case.... The decision will often turn on the extent to which the fingerprinted object was accessible to the defendant. For instance, do the circumstances negate the possibility that the defendant may have touched the object at some other time?

*Phelps v. State,* 594 S.W.2d 434, 436 (Tex. Crim.App.1980) (quoting *United States v. Cary,* 470 F.2d 469 (D.C.Cir.1972)); *see Nelson v. State,* 505 S.W.2d 271, 273 (Tex.Crim. 1974); *Gibson v. State,* 492 S.W.2d 526, 527 (Tex.Crim.App.1973); *Hall v. State,* 488 S.W.2d 94, 95–96 (Tex.Crim.App.1973); *LeBlanc v. State,* 424 S.W.2d 434, 435–36 (Tex. Crim.App.1968); *Mann v. State,* 420 S.W.2d 614, 615–16 (Tex.Crim.App.1967); *Postell v. State,* 663 S.W.2d 552, 554 (Tex.App.—Houston [1st Dist.] 1983), *aff'd,* 693 S.W.2d 462 (Tex.Crim.App.1985); *Patterson v. State,* 650 S.W.2d 453, 455 (Tex.App.—Houston [14th Dist.] 1982, pet. ref'd).

To summarize, the evidence eliminates any reasonable possibility that appellant's fingerprints could have been placed on the light bulb or doorjamb in Nickel's room before or after she was assaulted there. Appellant had not been a guest or employee at the motel and was not an employee in the recent construction of the motel. Just before her assailant entered the room, Nickel was making notes of her telephone call by the light of the lamp. When Brown and Thobani came to the room it was dark. Carter and Ranger Malinak found the bulb in the lamp unscrewed and appellant's fingerprint on the bulb. Appellant's bloody fingerprint was on the doorjamb. Succinctly put by Ranger Malinak, "We knew that whoever unscrewed the light bulb was our actor in this case."

In addition to the fingerprint evidence, some evidence of probative value was furnished by the forensic artist. Although Brown's time for observation was short and in poor light, he saw Nickel's assailant as he fled from her room. Brown gave a descrip-

tion of the man who fled to the forensic artist, Karen Taylor. Taylor's drawing made with Brown's description and guidance was in evidence along with appellant's 1986 photograph. Comparison of the drawing and photograph revealed similar facial characteristics. The jury could compare the drawing, photograph, and appellant's appearance in court.

Viewing the evidence in the light most favorable to the prosecution, the jury as the trier of fact could rationally find all of the elements of attempted capital murder, including appellant's identity, were proved beyond a reasonable doubt. We hold the evidence is legally sufficient to sustain the jury's verdict and overrule appellant's first point of error.

▮ In reviewing the factual sufficiency of the evidence, we consider all of the evidence. Appellant offered no evidence in his defense. During the course of the investigation, several suspects came to the attention of investigating officers. These suspects were eliminated because their fingerprints did not match those found in Nickel's room. A possibility that Nickel's husband could have hired her assailant was investigated and rejected. None of Nickel's property was taken by the man who attacked her. Her new Lincoln Continental automobile parked in front of her room and its keys in her purse were undisturbed. Her .38 caliber handgun, a substantial amount of cash, and jewelry were not taken. Nickel could not identify or meaningfully describe her attacker even when she was under hypnosis. According to an offense report, Nickel had said her attacker could have been black or of another race. She had told officers that her attacker had short, kinky, black hair and was black complected but he did not have a wide nose and features usually associated with African Americans. After the fingerprints in the room were identified as appellant's, officers in Maryland, where Brown then resided, showed Brown a photographic exhibit that included a "poor photograph" of appellant. Brown was unable to identify appellant's or any other photograph as that of the man he saw run from Nickel's room.

We have applied the standard of review required by *Cain, Clewis,* and *Stone;* after examining all of the evidence impartially and giving deference to the jury's verdict, we conclude that the jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. We hold that the evidence is factually sufficient to support the jury's verdict and overrule appellant's second point of error.

The judgment is affirmed.